

**WILLIAM LEE ANDERSON, II,**

    Plaintiff,

v.                                 Civil Action No. **3:16CV945**

**ARMOR CORRECTIONAL HEALTH SERVICES,** *et al.,*

    Defendants.

### MEMORANDUM OPINION

William Lee Anderson, II, a Virginia inmate proceeding *pro se* and *in forma pauperis*, filed this 42 U.S.C. § 1983 action.[1] In his Complaint, Anderson asserted, *inter alia*, that the bones in his elbow were broken into small pieces when a weight dropped on his elbow and that prison officials subsequently failed to provide him with adequate medical care. In his Complaint, Anderson contends that Defendants violated the Eighth Amendment:[2]

| | |
|---|---|
| Claim 1 | Dr. Landauer acted with deliberate indifference to Anderson's serious medical needs when she failed to provide proper medical care for Anderson's broken elbow. (ECF 1–8, at 2.) |
| Claim 2 | Dr. Luong acted with deliberate indifference to Anderson's serious medical needs when:<br>(a)    she failed to provide appropriate pain medication for the pain associated with Anderson's ankle and elbow injuries (ECF 1–1, at 7); and,<br>(b)    she failed to arrange for prompt surgery on Anderson's elbow (ECF No. 1, at 4). |
| Claim 3 | Ms. Taylor acted with deliberate indifference when she failed to promptly schedule a surgery date for Anderson's elbow. (ECF No. 1–9, at 1.) |

---

[1] The Court corrects the capitalization and spelling from the parties' submissions. The Court employs the pagination assigned by the CM/ECF docketing system.

[2] "Where the context, as here, makes clear a litigant's essential grievance, the complainant's additional invocation of general legal principles need not detour the district court from resolving that which the litigant himself has shown to be his real concern." *Beaudett v. City of Hampton*, 775 F.2d 1274, 1278 (4th Cir. 1985).

| Claim 4 | Armor Correctional Health Services violated Anderson's right under the Eighth Amendment by its policy of denying medical treatment, such as surgery, if the surgery is expensive. (ECF No. 1–8, at 1). |

The matter is before the Court on the Motion for Summary Judgment filed by Armor Correctional Health Services ("Armor"), Dr. Diane Landauer ("Dr. Landauer"), Dr. Q. Luong ("Dr. Luong"), and Stacy Taylor ("Ms. Taylor") (collectively, "Defendants"). Anderson has not responded. The record reflects that Anderson did not suffer from a traumatic elbow injury. Rather, Anderson had chronic elbow and ankle pain for which he received significant medical treatment, including surgery. For the reasons that follow, the Motion for Summary Judgment (ECF No. 55) will be GRANTED and the action will be DISMISSED.

## I. STANDARD FOR SUMMARY JUDGMENT

Summary judgment must be rendered "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). It is the responsibility of the party seeking summary judgment to inform the court of the basis for the motion, and to identify the parts of the record which demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the pleadings, depositions, answers to interrogatories, and admissions on file." *Id.* at 324 (internal quotation marks omitted). When the motion is properly supported, the nonmoving party must go beyond the pleadings and, by citing affidavits or "'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting former Fed. R. Civ. P. 56(c) and 56(e) (1986)).

In support of their Motion for Summary Judgment, Defendants have submitted: (1) Dr. Landauer's Declaration ("Landauer Decl.," ECF No. 56–11, at 1–13); (2) Dr. Luong's Declaration ("Luong Decl.," ECF No. 56–11, at 14–30); (3) Ms. Taylor's Declaration ("Taylor Decl.," ECF No. 56–11, at 31–35) and, a host of Anderson's medical records and other correspondence.[3]

As Anderson failed to respond, Anderson fails to cite the Court to any evidence that he wishes the Court to consider in opposition to the Motion for Summary Judgment. *See* Fed. R. Civ. P. 56(c)(3) (emphasizing that "[t]he court need consider only the cited materials" in deciding a motion for summary judgment). Anderson's complete failure to present any evidence to counter Defendants' Motion for Summary Judgment permits the Court to rely solely on Defendants' submissions in deciding the Motion for Summary Judgment.[4] *See Forsyth v. Barr*, 19 F.3d 1527,

---

[3] Given the lack of dispute as to the accuracy of Defendants' Declarations, the Court omits any secondary citations from the declarations to supporting documents.

[4] The Court notes that at the end of his Complaint, Anderson states:

I have read the foregoing petition and hereby verify that the matters alleged therein are true, except as to matters alleged on information and belief, and, as to those, I believe them to be true. I certify under the penalty of perjury that the foregoing is true and correct to the best of my recollections and knowledge.

(ECF No. 1–9, at 3.) Such a statement fails to transform the complaint into admissible evidence for purposes of summary judgment. *See Hogge v. Stephens,* No. 3:09CV582, 2011 WL 2161100, at *2–3 & n. 5 (E.D. Va. June 1, 2011) (treating statements sworn to under penalty of perjury, but made upon information and belief, as "mere pleading allegations" (quoting *Walker v. Tyler Cty. Comm'n,* 11 F. App'x 270, 274 (4th Cir. 2001))). Moreover, the Court previously informed Anderson that for the purposes of summary judgment, "any verified allegations must be set forth in a separate document titled 'Affidavit' or 'Sworn Statement,' and reflect that the sworn statements of fact are made on personal knowledge and that the affiant is competent to testify on the matter stated therein." (ECF No. 14 at 2 (citing Fed. R. Civ. P. 56(c)(4).)

1537 (5th Cir. 1994) ("Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment." (quoting *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915 & n.7 (5th Cir. 1992))).

Accordingly, the following facts are established for the Motion for Summary Judgment. The Court draws all permissible inferences in favor of Anderson.

## II. UNDISPUTED FACTS

### A.    Anderson's Medical Care at Augusta Correctional Center ("ACC")

In 2014, Anderson was incarcerated in ACC. (Landauer Decl. ¶¶ 1–5.) On October 9, 2014, Dr. Landauer saw Anderson in conjunction with, *inter alia*, Anderson's complaints of elbow pain. (*Id.* ¶ 5.) Dr. Landauer "diagnosed [Anderson with] right elbow pain/tendonitis." (*Id.*) On October 16, 2014, Dr. Landauer saw Anderson in a follow-up appointment and administered a steroid injection with anesthetic to ease the discomfort in Anderson's elbow. (*Id.* ¶ 6.)

Anderson was next seen for complaints of elbow pain on February 27, 2015. (*Id.* ¶ 7.) In the interval between the October 16, 2014 appointment and February 27, 2015, Anderson was seen "multiple times by members of the ACC medical staff for various complaints, none of which involved [Anderson's] elbow." (*Id.*) During the February 27, 2015 appointment, Anderson complained to the nursing staff that there was something wrong with his elbow and noted he had been having pain in the elbow for six months. (*Id.*) The nursing staff noted Anderson had a full range of motion in the elbow and referred him to the physician for a non-healing wound. (*Id.*)

On March 5, 2015, Dr. Landauer evaluated Anderson's right elbow. (*Id.* ¶ 8.) At this encounter, Anderson "complained of chronic right elbow pain in addition to other constitutional and dental complaints." (*Id.*) Dr. Landauer found that Anderson's "right elbow was mildly warm with erythema and two small verrucous lesions. These findings were not present during [Dr.

4

Landauer's] examination in October 2014." (*Id.*) Dr. Landauer diagnosed Anderson as "having chronic olecranon bursitis and scheduled for him to return to the medical clinic the following day for further treatment." (*Id.*)

On March 6, 2015, Dr. Landauer saw Anderson to treat the lesions on his right elbow. (*Id.* ¶ 9.) Anderson "had a painful scab and 2 verrucous lesions on his right elbow. The area was cleaned using an appropriate antiseptic for the procedures and [Dr. Landauer] used a . . . scalpel to pierce the verrucous lesions." (*Id.*) Dr. Landauer diagnosed Anderson as suffering from "olecranon bursitis, verrucous lesions and painful scab on the right elbow." (*Id.*) Dr. Landauer instructed Anderson to employ "warm compresses twice daily, daily Bacitracin and Band-Aid dressing changes," and to follow up with an appointment in one week. (*Id.*)

On March 13, 2015, Dr. Landauer again examined Anderson. (*Id.* ¶ 10.) Anderson's "right elbow was much improved and he was complaining of right anterior tibial pain. [Anderson] reported the remote history of a motorcycle accident in 2003 with multiple fractures . . ." (*Id.*) Dr. Landauer directed Anderson "to continue to apply A&D ointment two times a day for two weeks . . . [and to] try stretching exercises, massage and gentle walking for the leg pain complaints and requested if a telemedicine consult could be arranged with the orthopedic department at Medical College of Virginia." (*Id.*)

On March 18, 2015, Anderson appeared in the medical department with complaints of right elbow pain and infection. (*Id.* ¶ 11.) The nursing "evaluation revealed the right elbow was red, hot, tender to touch," and recommended review by a doctor. (*Id.*) Thereafter, Anderson was evaluated by David MacDonald, D.O. (*Id.*) Anderson complained of right elbow pain and drainage, decreased range of motion, and no fever or chills. (*Id.*) Dr. MacDonald found Anderson "to be in no apparent distress with right elbow erythema without drainage. Dr. MacDonald

diagnosed cellulitis/bursitis and ordered an aerobic culture, an x-ray of the right elbow, Bactrim DS one pill twice a day for 10 days and a follow-up appointment the following week." (*Id.*)

On March 19, 2015, Dr. Landauer examined Anderson for complaints of a rash on his hands, arms, face, and legs. (*Id.* ¶ 12.) Anderson had a red, tender, right elbow, "with erythema measuring 6cm x 6cm." (*Id.*) Dr. Landauer diagnosed Anderson with "recurrent right olecranon bursitis and a sulfa rash." (*Id.*) Dr. Landauer discontinued the Bactrim and prescribed an alternative medication. (*Id.*)

On March 20, 2015, Dr. Landauer again examined Anderson. (*Id.* ¶ 13.) Dr. Landauer noted that Anderson's rash generally was receding. (*Id.*) Anderson's vital signs were normal. (*Id.*)

"On March 23, 2015, the medical record reflects [Anderson] refused to [see] the doctor for right elbow follow-up. On March 24, 2015, there is a notation in the medical record that the x-ray of the right elbow previously ordered by Dr. MacDonald had been taken." (*Id.* ¶ 14.)

On April 14, 2015, Anderson was seen for a routine chronic care nursing visit. (*Id.* ¶ 15.) Anderson said his elbow was painful to the touch. (*Id.*) The nursing evaluation did not reveal any swelling or redness of the elbow. (*Id.*)

On April 17, 2015, Dr. Landauer evaluated Anderson for prescription renewals. (*Id.* ¶ 16.) Dr. Landauer noted Anderson's "right elbow was uncomfortable to palpation but without evidence of infection or drainage. [Dr. Landauer's] examination of the right elbow revealed no warmth or erythema, a healed scar, and minimal tenderness." (*Id.*) Dr. Landauer's "treatment plan was for [Anderson] to rub analgesic balm on the right elbow two times a day for 60 days by rubbing it in to the elbow, Baclofen 20mg to be taken by mouth twice daily for 180 days and an increase in Elavil to 50mg every evening for 180 days." (*Id.*)

Anderson "next complained of elbow pain at a nurse sick call visit on May 28, 2015." (*Id.* ¶ 17.) At this nursing encounter, Anderson "complained of pain and [cracking] in the right elbow which in turn caused cramping in his right hand." (*Id.*) The nursing assessment confirmed the cracking and popping. (*Id.*) Anderson claimed he had a bone chip in his elbow and wanted it removed. (*Id.*) Anderson was referred to a physician for evaluation. (*Id.*)

On June 10, 2015, at a routine chronic care visit follow-up for hepatitis C, Dr. MacDonald "also evaluated [Anderson] for right elbow pain which [Anderson] stated was worse when the elbow [was] extended." (*Id.* ¶ 18.) "Dr. MacDonald's examination of the right elbow demonstrated tenderness to palpation over the olecranon. Review of the previous x-rays revealed a questionable bone chip versus a calcium deposit that was only seen on the lateral view. Dr. MacDonald's assessment included hepatitis C virus, trigger finger and elbow pain." (*Id.*) Anderson "was advised of what exercises to avoid, was prescribed 400mg magnesium tablets, one daily for 90 days, and blood work was ordered." (*Id.*)

At a June 30, 2015 nursing encounter, Anderson "stated his elbow was sore and cracked on range of motion." (*Id.* ¶ 19.) Anderson "was referred to the physician for evaluation and treatment of the elbow." (*Id.*)

On July 6, 2015, Anderson showed up in the medical clinic "for re-evaluation of the right elbow and to get a renewal of a prescription for nasal spray." (*Id.* ¶ 20.) Anderson "left without being seen by the doctor stating that he did not want to see the doctor who was at ACC medical that day." (*Id.*) On July 8, 2015, Anderson returned to the medical department "for another nurse sick call evaluation regarding his right elbow. At this encounter [Anderson] claimed to be taking Elavil and Baclofen for his elbow and that those medications helped alleviate some of his elbow symptoms." (*Id.*) Anderson "reported his right elbow symptoms were becoming more constant

and more severe, that he fractured his elbow in September 2014, that . . . his elbow got hot to touch every month, [and] that he stopped his magnesium supplement because it caused itching." (*Id.*) Anderson acknowledged that "upon stopping the magnesium the elbow would get stuck in the bent position and cause the middle and ring fingers on his hand not to work. The staff nurse scheduled [Anderson] to see the physician." (*Id.*)

> On July 13, 2015, Dr. MacDonald examined Anderson. (*Id.* ¶ 21.) Anderson
>
> reported a history of the right elbow locking up, having to push the arm out to straighten the elbow and spasms in his hand. Dr. MacDonald's examination revealed that motor testing, grip testing, shoulder shrug/upper extremity muscle testing were not consistent. Dr. MacDonald also noted there was no tenderness to palpation in the ulnar gutter of the right elbow. Sensory testing was noted to be intact with locally subjective tenderness of the olecranon. Dr. MacDonald diagnosed chronic right elbow pain, prescribed analgesic balm and recommended follow-up as needed.

(*Id.*)

On July 30, 2015, during the course of examining Anderson for complaints related to a cough, Dr. Landauer re-examined Anderson's "right elbow which revealed no warmth or erythema." (*Id.* ¶ 22.) Dr. Landauer noted that Anderson "was limiting his range of motion of the elbow stating that it clicked and hurt on full range of motion. [Dr. Landauer] diagnosed [Anderson] with right elbow pain with a history of past infection at the site . . . [and] ordered a repeat x-ray series of the right elbow." (*Id.*) Anderson was instructed to follow-up in three weeks to consider a steroid injection or possible orthopedic referral. (*Id.*)

On August 4, 2015, an x-ray series of Anderson's right elbow was completed. (*Id.* ¶ 23.) On August 20, 2015, Anderson reported to Dr. Landauer that "his right elbow continued to be stiff with occasional clicking or locking." (*Id.*) Dr. Landauer noted Anderson was using an elbow sleeve. (*Id.*) Dr. Landauer's examination revealed that Anderson was alert, in no acute distress, but his "right elbow was stiff with decreased range of motion and some crepitus and locking."

(*Id.*) Dr. Landauer "did not find any evidence of erythema, warmth, purulence, or deformity of the elbow when conducting [her] examination." (*Id.*) Anderson's "clinical findings during examination were consistent with [Dr. Landauer's] clinical assessment and diagnosis of chronic right elbow pain, no evidence of infection, now does have clicking, decreased range of motion, stiffness, and radiographic evidence of a small chip versus calcification in the soft tissue only visible on lateral projection." (*Id.*) Dr. Landauer dispensed analgesic balm to Anderson to be applied to the elbow, "as opposed to administering an intraarticular steroid injection, in light of [her] clinical findings at this encounter." (*Id.*) Dr. Landauer also "commenced the process to obtain an orthopedic consultation." (*Id.*)

On September 18, 2015, Dr. Landauer "examined Anderson for complaints of toenail fungus and sinus issues." (*Id.* ¶ 24.) Dr. Landauer also examined Anderson's right elbow which was in a neoprene brace and noted it had no erythema or warmth. (*Id.*) Dr. Landauer renewed Anderson's prescription for analgesic balm. (*Id.*)

On September 22, 2015, Anderson was seen by the orthopedic specialist for further evaluation of the right elbow. (*Id.* ¶ 25.) "At this encounter the orthopedist found crepitus and locking of the right elbow. The orthopedic specialist diagnosed right elbow pain, osteoarthritis right elbow and locking of right elbow." (*Id.*) Additionally,

> the orthopedic specialist recommended ordering an MRI of the right elbow to evaluate for possible loose body in the joint space. At this encounter the record reflects that [Anderson] was advised to use his elbow as tolerated. On September 23, 2015, Dr. MacDonald made a request for the MRI that had been recommended by the orthopedic specialist the day before.

(*Id.*)

"On October 29, 2015, [Anderson] had the MRI of his right elbow completed at an offsite facility." (*Id.* ¶ 26.) On November 3, 2015,

> Dale Moreno, M.D., noted the October 29, 2015, MRI of the right elbow demonstrated an olecranon osteophyte. The MRI report of the October 29, 2015, imaging study found motion artifact somewhat compromised the study. There was noted to be a small degenerative olecranon osteophyte. The visualized bony structures were otherwise unremarkable and there was no evidence of any fracture. The muscles which were visualized in the study appeared normal as did the tendons of the distal biceps and triceps muscle. The interpreting radiologist, Matthew P. Shapiro, M.D.'s impression was olecranon osteophyte.

(*Id.* ¶ 27.)

Anderson "was next scheduled to be evaluated by the physician at the chronic care clinic on December 7, 2015." (*Id.* ¶ 28.) Anderson, however, left before being seen by the doctor. (*Id.*) On December 21, 2015, Anderson was evaluated by an ACC physician to renew his medications. (*Id.* ¶ 29.) During this meeting, Anderson made no mention of right elbow pain. (*Id.*) On January 13, 2016, Anderson was transferred to the Greensville Correctional Center ("GRCC"). (*Id.* ¶ 30.)

Dr. Landauer last saw Anderson on October 29, 2015. (*Id.* ¶ 31.) Anderson did not return to see Dr. Landauer "for follow-up regarding his MRI results or for additional treatment of his right elbow after this date nor did [Dr. Landauer] provide any care for [Anderson] after his arrival at GRCC." (*Id.*)

Dr. Landauer insists that she provided appropriate care for Anderson's complaints. (*Id.* ¶ 32.) "[W]hile at ACC [Anderson] was also evaluated on multiple other occasions by other healthcare providers whose diagnoses were similar to the ones [Dr. Landauer] had ascribed to [Anderson's] symptoms." (*Id.*) Dr. Landauer swears that,

> [a]t no time during the course of my encounters with [Anderson] did [Anderson] ever exhibit clinical signs or symptoms compatible with a fracture in the elbow joint as described in the body of his lawsuit. While not compatible with a fracture [Anderson's] right elbow complaints had varied objective clinical findings that ranged from muscular, to inflammatory, to infectious to degenerative musculoskeletal . . .

(*Id.* ¶ 33.) Dr. Landauer contends that she

provided appropriate care and treatment for [Anderson's] complaints of right elbow pain at various times throughout the course of his tenure at ACC which included, amongst other things, an intraarticular steroid injection, treatment of verrucous lesions, treatment of a painful eschar, treatment of elbow pain, imaging studies and requesting an orthopedic referral.

(*Id.*)

## B. Anderson's Medical Care at GRCC

On January 19, 2016, Anderson was evaluated for a new intake physical at GRCC. (Luong Decl. ¶ 7.) Anderson "had no complaints and was requesting a renewal of his bottom bunk privileges. [Anderson] was noted to be well appearing and examination of the right elbow revealed a decreased range of motion with clicking. At this encounter the medical record references x-rays of [Anderson's] right elbow showing an olecranon osteophyte." (*Id.*) Staff ordered bloodwork and Anderson was scheduled for a 4-week follow-up visit to discuss the results of the bloodwork. (*Id.*)

On February 22, 2016, during an encounter about his prescriptions, Anderson stated he was experiencing increasing right elbow pain and difficulty using his arm. (*Id.* ¶ 8.) Anderson "relayed a history of injuring the right elbow in the summer of 2015, secondary to a weight lifting injury . . . At this encounter a request for an orthopedic consult was submitted. A large elbow support was ordered for [Anderson] and he was advised to wear the support daily." (*Id.*)

On March 16, 2016, Anderson was evaluated by orthopedic specialist Sharad Saraiya, M.D. (*Id.* ¶ 10.) Dr. Saraiya observed,

that the MRI showed an olecranon osteophyte but no loose body. Clinically Dr. Saraiya noted a clicking right elbow which seemed like a loose body in the right elbow joint despite the negative MRI. Dr. Saraiya opined that x-rays carried out at Dr. Saraiya's office on the day of the encounter showed an olecranon osteophyte with a possible loose body at the tip of the olecranon . . . Dr. Saraiya recommended a neoprene sleeve for the right elbow, requested obtaining approval

for surgery to include arthroscopic removal of loose body, excision of olecranon spur and, approval for [Anderson] to see Manjit Dhillon, M.D., at Colonial Orthopedics.

(*Id.*) On March 23, 2016, an authorization request was sent for right elbow surgery and a neoprene sleeve was ordered for Anderson's right elbow. (*Id.* ¶ 11.)

On April 26, 2016, Anderson was approved for surgery. (*Id.* ¶ 12.) On April 28, 2016, Anderson appeared at the medical department to check on the status of his elbow sleeve, which had been ordered. (*Id.* ¶ 13.)

On June 30, 2016, Dr. Luong evaluated Anderson. (*Id.* ¶ 14.) Anderson "reported having had elbow pain for several months and was requesting an increase in the dosage of Baclofen for treatment." (*Id.*) Dr. Luong noted that Anderson "was awaiting surgery of the right elbow to remove a loose body and excise a bone spur. At this time [Anderson] was taking Mobic 7.5mg daily to treat his symptoms." (*Id.*) Dr. Luong observed that Anderson appeared well, but had "mild tenderness to palpation of the posterior aspect of the right elbow; but, no effusion and the elbow joint had a full range of motion." (*Id.*) Dr. Luong changed the dosing schedule for the Mobic to treat Anderson's symptoms. (*Id.*)

On August 12, 2016, Anderson inquired about "the status of his right elbow surgery appointment and was advised by nursing staff that the procedure had not yet been approved." (*Id.* ¶ 16.) On August 16, 2016, Dr. Luong evaluated Anderson for Baclofen renewal. (*Id.*) Anderson mostly complained about difficulties with his ankle. (*Id.*)

On August 19, 2016, there is an entry in Anderson's medical records where the UMD referral coordinator was advised that Anderson had already been approved for right elbow surgery and an expedited appointment with orthopedics was requested. (*Id.* ¶ 17.) On September 22, 2016,

"the UMD coordinator confirmed that [Anderson] had an orthopedic appointment scheduled for 3:00 p.m., on September 27, 2016." (*Id.*)

On September 27, 2016, Dr. Dhillon at Colonial Orthopedics evaluated Anderson. (*Id.* ¶ 18.). Dr. Dhillon recommended that Anderson

> be scheduled to undergo a right elbow arthroscopy for removal of the loose body after he had conducted a review of the prior elbow MRI. Dr. Dhillon also recommended [Anderson] start Neurontin for pain control and that [scheduling] should contact his office once surgery had been authorized to schedule a date for the procedure after he had evaluated the MRI.

(*Id.*) On September 29, 2016, Dr. Luong "completed a referral request for the right elbow surgery with Dr. Dhillon, and noted that GRCC administrative staff had provided information to Dr. Dhillon's office on how to retrieve [Anderson's] previous right elbow MRI." (*Id.* ¶ 19.)

On October 10, 2016, Anderson was evaluated by the nurse practitioner for right arm pain. (*Id.* ¶ 20.) The nurse practitioner found Anderson to be in "no acute distress but noted that he was agitated and threatening. Examination of the right elbow showed intact sensation, decreased right hand-grip strength, and wearing an arm brace." (*Id.*) Anderson's "Baclofen and analgesic balm were reordered and [Anderson] was advised to follow up as needed." (*Id.*)

Dr. Luong next saw Anderson on November 1, 2016. (*Id.* ¶ 21.) Anderson complained about ankle pain, but did not mention his elbow. (*Id.*) Dr. Luong prescribed a variety of treatments to address Anderson's ankle pain. (*Id.*)

On January 6, 2017, Anderson showed up for sick call complaining about "right elbow and shoulder pain and right hand numbness." (*Id.* ¶ 22.) Anderson was scheduled for a follow-up visit and given Motrin. (*Id.*)

On January 11, 2017, Dr. Luong evaluated Anderson in a follow up to the sick call appointment. (*Id.* ¶ 23.) "At this encounter [Anderson] complained of a two year history of pain

in the right shoulder and elbow as well as a 1–2 year history of numbness and weakness of the right hand." (*Id.*) Dr. Luong's examination revealed that Anderson's

> right elbow had no swelling, but had posterior tenderness, and a decreased range of motion. The grip strength in [Anderson's] right hand was intact with a normal radial pulse. [Dr. Luong] diagnosed right elbow and shoulder pain and right hand numbness. [Dr. Luong] noted in the medical records [that Anderson] was still awaiting right elbow arthroscopy.

(*Id.*) Among other things, Dr. Luong changed Anderson's Neurontin prescription to 600mg twice a day, for 180 days. (*Id.*) Twice later that month, Anderson was evaluated in conjunction with complaints of ankle pain. (*Id.* ¶¶ 24, 25.)

On February 17, 2017, Anderson showed up at sick call complaining of right hand pain. (*Id.* ¶ 26.)

Anderson's medical records for February 24, 2017 reflect that, "Dr. Dhillon's office had contacted the UMD coordinator at GRCC to request another MRI of [Anderson's] right elbow to be completed prior to scheduling any surgery. The UMD coordinator directed this request to GRCC Medical Director, Vincent Gore, M.D., who completed the request as noted." (*Id.* ¶ 28.)

On March 9, 2017, Anderson had another MRI of his right elbow. (*Id.* ¶ 29.) On March 16, 2017, Dr. Luong evaluated Anderson

> in follow-up to the MRI of March 9, 2017. At this encounter [Anderson] stated the MRI was of the right elbow, not the left elbow as noted on the MRI report, and that he had right elbow pain for the last three years, when a weight had dropped on the right elbow. [Anderson] went on to report at this encounter that the elbow pain had worsened in the past three months. [Dr. Luong's] examination of the right elbow found tenderness to palpation both anteriorly and posteriorly, accompanied by decreased range of motion. [Dr. Luong] noted in the medical record that the recent right elbow MRI was suspicious for an osteochondral lesion, probably unstable, of the posterior capitellum measuring approximately 7mm and [she] requested additional orthopedic follow-up for the right elbow.

(*Id.*)

On April 14, 2017, Anderson returned to the medical department to check the status of his orthopedic referrals. (*Id.* ¶ 30.) Medical staff made e-mail inquiries to obtain additional information. (*Id.*)

On May 12, 2017, Dr. Luong entered orders for the two orthopedic surgeries Anderson was going to have in the next two months: one for Anderson's ankle, the other for his right elbow. (*Id.* ¶ 31.)

On June 20, 2017, Dr. Luong evaluated Anderson for medical clearance for his pending right elbow surgery. (*Id.* ¶ 36.) On June 22, 2017, Dr. Dhillon performed surgery on Anderson's right elbow. (*Id.* ¶ 37.) Dr. Dhillon performed "Outerbridge arthroplasty with removal of loose body, and ulnar nerve decompression with posterior subcutaneous transposition." (*Id.*) The next day, Dr. Luong reviewed this procedure note, prescribed Motrin, and requested a referral for post-operative follow-up with the orthopedist. (*Id.*)

Following the surgery, Anderson received regular medical care and Dr. Luong submitted requests for Anderson to receive physical therapy for his right elbow. (*See, e.g., id.* ¶¶ 38–44.) On December 1, 2017, Dr. Luong evaluated Anderson on a routine follow-up appointment for his hepatitis C. (*Id.* ¶ 47.) Anderson did not voice any complaint relating to his right elbow. (*Id.*) Sometime in 2018, Anderson was transferred from GRCC to Buckingham Correctional Center. (*Id.* ¶ 48.) After Anderson's transfer, Dr. Luong had no further interaction with Anderson. (*Id.*)

Dr. Luong swears that,

> [a]t no time during the course of [her] encounters with [Anderson] did [Anderson] ever exhibit clinical signs or symptoms compatible with an acute or chronic fracture in the elbow joint as described in the body of his lawsuit. At GRCC [Anderson's] right elbow signs and symptoms were compatible with a chronic degenerative musculoskeletal condition that did not warrant acute, urgent or emergent intervention as would certain fractures in the upper extremity as suggested by [Anderson] in his complaint.

(*Id.* ¶ 50.) Dr. Luong asserts that she

> provided appropriate care and treatment for [Anderson's] complaints of right elbow pain and/or other conditions that [Anderson] presented with at various times throughout the course of his tenure at GRCC. This included, amongst other things, prescribing different types of medications for [Anderson's]s subjective complaints of pain such as Motrin, Mobic, Indocin, Norco, Tramadol, Baclofen, and Neurontin, prescribing antibiotics to treat infections, ordering various imaging studies, and making referrals to the orthopedic specialist for additional evaluation and treatment.

(*Id.*)

With respect to Anderson's need for elbow surgery, Dr. Luong swears that she made timely and appropriate referrals for Anderson to obtain specialist care when they were warranted and she has no involvement in scheduling the actual appointment with the specialist provider after she makes the referral request and the off-site utilization management review approves it. (*Id.* ¶ 51.) "In this matter the elbow surgery requests had been approved by utilization management and were pending appointment scheduling. These routine, non-urgent appointments for specialist evaluation and/or treatment are arranged through the UMD coordinators at GRCC." (*Id.*) Dr. Luong had "no control or authority over the UMD coordinators at GRCC or the manner in which these appointments are scheduled." (*Id.*) Dr. Luong and others made inquiries concerning the orthopedic referral for Anderson and were advised that they were awaiting notification of the appointment. (*Id.*)

Ms. Taylor, the Health Service Administrator ("HSA") at GRCC from October 1, 2014 until April 5, 2017, provided an explanation as to how the Virginia Department of Corrections coordinates medical appointments at GRCC. (Taylor Decl. ¶¶ 1, 5.) Ms. Taylor asserts that as HSA she

> was responsible for planning, directing and coordinating the delivery of health services for the medical department at that correctional facility. The HSA position at GRCC was administrative and managerial in nature, predominantly relating to

compliance with Virginia Department of Corrections and GRCC guidelines, directives and operating procedures. In [her] role as HSA [she] did not schedule appointments for specialty referrals or surgical procedures as this was the responsibility of the UMD coordinators at GRCC. As the HSA part of [her] role included providing supervisory support for the UMD coordinators and to assist them with problem solving in the event a UMD coordinator had a need and requested assistance.

(*Id.* ¶ 5.)

Ms. Taylor does not recall a UMD coordinator alerting her to any specific scheduling matter with respect to Anderson. (*Id.* ¶ 7.) Nevertheless, Ms. Taylor acknowledges "at various times, that the UMD coordinators expressed concern regarding difficulties they encountered when scheduling appointments for off-site encounters with specialists," including orthopedics. (*Id.*) Further,

[a] review of the informal complaints and medical records indicated there had been difficulty scheduling [Anderson's] right elbow surgery as the orthopedic specialist had no dates that were available to perform the surgery. The clinical and administrative healthcare staff at GRCC, including [Ms. Taylor] as HSA, had no control over what availability off-site physicians had on their respective schedules for procedures or office visits.

During the time [Anderson] was housed at GRCC [Ms. Taylor] had multiple interactions with the administrative staff at Colonial Orthopedics responsible for scheduling regarding the availability and scheduling issues the UMD coordinators at GRCC were specifically experiencing with orthopedic scheduling. In seeking to resolve the orthopedic scheduling concerns that had been brought to [Ms. Taylor's] attention by the UMD coordinators a plan of action was formulated in December 2016 to facilitate scheduling for healthcare provider appointments at Colonial Orthopedics . . .

. . . [T]he UMD coordinators were working diligently to resolve the surgery scheduling matter concerning [Anderson] and were ultimately able to schedule [Anderson's] right elbow surgery for June 22, 2017.

(*Id.* ¶¶ 8–10 (paragraph numbers omitted).)

## III. ANALYSIS

### A. Anderson's Demands for Equitable Relief Are Moot

"[A]s a general rule, a prisoner's transfer or release from a particular prison moots his claims for injunctive and declaratory relief with respect to his incarceration there." *Rendelman v. Rouse*, 569 F.3d 182, 186 (4th Cir. 2009) (citing *Incumaa v. Ozmint*, 507 F.3d 281, 286–87 (4th Cir. 2007); *Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir. 1991); *Taylor v. Rogers*, 781 F.2d 1047, 1048 n.1 (4th Cir. 1986)). As Anderson is no longer confined in a facility in which the named Defendants are responsible for his medical care, his demands for equitable relief will be DISMISSED AS MOOT.

### B. Eighth Amendment Claims

To survive a motion for summary judgment on an Eighth Amendment claim, Anderson must demonstrate that Defendants acted with deliberate indifference to his serious medical needs. *See Brown v. Harris*, 240 F.3d 383, 388 (4th Cir. 2001). A medical need is "serious" if it "has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008) (quoting *Henderson v. Sheahan*, 196 F.3d 839, 846 (7th Cir. 1999)).

The subjective prong of a deliberate indifference claim requires the plaintiff to demonstrate that a particular defendant actually knew of and disregarded a substantial risk of serious harm to his person. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994). "Deliberate indifference is a very high standard—a showing of mere negligence will not meet it." *Grayson v. Peed*, 195 F.3d 692, 695 (4th Cir. 1999) (citing *Estelle v. Gamble*, 429 U.S. 97, 105–06 (1976)).

> [A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be

aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Farmer*, 511 U.S. at 837. *Farmer* teaches "that general knowledge of facts creating a substantial risk of harm is not enough. The prison official must also draw the inference between those general facts and the specific risk of harm confronting the inmate." *Johnson v. Quinones*, 145 F.3d 164, 168 (4th Cir. 1998) (citing *Farmer*, 511 U.S. at 837). Thus, to survive a motion for summary judgment under the deliberate indifference standard, a plaintiff "must show that the official in question subjectively recognized a substantial risk of harm . . . [and] that the official in question subjectively recognized that his actions were 'inappropriate in light of that risk.'" *Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 303 (4th Cir. 2004) (quoting *Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997)).

In evaluating a prisoner's complaint regarding medical care, the Court is mindful that, "society does not expect that prisoners will have unqualified access to health care" or to the medical treatment of their choosing. *Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (citing *Estelle*, 429 U.S. at 103–04). Absent exceptional circumstances, an inmate's disagreement with medical personnel with respect to a course of treatment is insufficient to state a cognizable constitutional claim. *See Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985) (citing *Gittlemacker v. Prasse*, 428 F.2d 1, 6 (3d Cir. 1970)).

### 1.   Claim 1–Dr. Landauer

In Claim 1, Anderson contends that Dr. Landauer acted with deliberate indifference to Anderson's serious medical needs when she failed to provide proper medical care for Anderson's broken elbow. It is unnecessary to repeat again here the full range of care Dr. Landauer provided to Anderson. *Brown*, 240 F.3d at 389 ("[A]n official who responds reasonably to a known risk has not 'disregard[ed] an excessive risk to inmate health or safety,' and has therefore not acted with

deliberate indifference." (second alteration in original) (quoting *Farmer*, 511 U.S. at 837)). It suffices to say that

> "[a]t no time during the course of [Dr. Landauer's] encounters with [Anderson] did [Anderson] ever exhibit clinical signs or symptoms compatible with a fracture in the elbow joint as described in the body of his lawsuit. While not compatible with a fracture [Anderson's] right elbow complaints had varied objective clinical findings that ranged from muscular, to inflammatory, to infectious to degenerative musculoskeletal . . .

(Landauer Decl. ¶ 33.) The record further reveals that Dr. Landauer did not act with deliberate indifference to Anderson's elbow problems because she reasonably responded to those complaints by providing "amongst other things, an intraarticular steroid injection, treatment of verrucous lesions, treatment of a painful eschar, treatment of elbow pain, imaging studies . . . and requesting an orthopedic referral" and providing a variety of medications. (*Id.*) Accordingly, Claim 1 will be DISMISSED.

### 2. Claim 2(a)–Dr. Luong

In Claim 2(a), Anderson contends that Dr. Luong acted with deliberate indifference when she failed to provide appropriate pain medication for the pain associated with Anderson's ankle and elbow injuries. The record reflects that Dr. Luong provided Anderson with a variety of medications to treat his pain. "Whether and how pain associated with medical treatment should be mitigated is for doctors to decide free from judicial interference, except in the most extreme situations." *Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996). Anderson fails to demonstrate such extreme circumstances here. *See, e.g., Martinez v. Mancusi*, 443 F.2d 921, 924–25 (2d Cir. 1970) (granting relief when prison doctor forced prisoner plaintiff, without hospital ordered pain medication, to walk out of hospital and stand for meals after plaintiff had leg surgery for which hospital specialist had ordered plaintiff to lie flat and not to walk). Accordingly, Claim 2(a) will be DISMISSED.

20

### 3. Claims 2(b) and 3–Dr. Luong and Ms. Taylor

In Claims 2(b) and 3, Anderson contends that Dr. Luong and Ms. Taylor acted with deliberate indifference to Anderson's need for elbow surgery. The record reflects that Dr. Luong made timely and appropriate referrals for Anderson to obtain specialist care when they were warranted. Further, once Dr. Luong made the referral request and the off-site utilization management review approved it, Dr. Luong had no involvement in scheduling the specialist care. These routine, non-urgent appointments for specialist evaluation and/or treatment were arranged through the UMD coordinators at GRCC. Dr. Luong had no control or authority over the UMD coordinators at GRCC or the manner in which they scheduled appointments. Nevertheless, Dr. Luong did not stand indifferent to the delay in scheduling Anderson's non-emergent surgery. Instead, Dr. Luong and others made inquiries concerning the orthopedic referral for Anderson and were advised that they were awaiting notification of the appointment.

Additionally, although Ms. Taylor as HSA had no control over what availability off-site physicians had on their respective schedules for procedures, she attempted to resolve the orthopedic scheduling concerns that had been brought to her attention. In December of 2016, Ms. Taylor formulated a plan of action to address the scheduling problems the UMD coordinators had experienced in scheduling orthopedic appointments with Colonial Orthopedics. Within roughly six months of those actions, Anderson received surgery on his right elbow. As Anderson fails to demonstrate that Dr. Luong and Ms. Taylor acted with deliberate indifference to his need for surgery, Claims 2(b) and 3 will be DISMISSED.

### 4. Claim 4–Armor

In Claim 4, Anderson contends Armor violated his rights under the Eighth Amendment by its policy of denying medical treatment, such as surgery, if the surgery is expensive. A private

corporation, such as Armor, cannot be held liable "for torts committed by [its employees] when such liability is predicated solely upon a theory of *respondeat superior*." *Austin v. Paramount Parks, Inc.*, 195 F.3d 715, 728 (4th Cir. 1999) (citations omitted). Instead, "a private corporation is liable under § 1983 *only* when an official policy or custom of the corporation causes the alleged deprivation of federal rights." *Id.* (citations omitted). Anderson has failed to advance any evidence that demonstrates that Armor has such a policy of denying appropriate medical treatment. Accordingly, Claim 4 against Armor will be DISMISSED.

## IV. CONCLUSION

The Motion for Summary Judgment (ECF No. 55) will be GRANTED. Anderson's demands for equitable relief will be DISMISSED AS MOOT. Anderson's claims and the action will be DISMISSED.

An appropriate Order shall accompany this Memorandum Opinion.

Date: 25 January 2019
Richmond, Virginia

/s/ _____
John A. Gibney, Jr.
United States District Judge